UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

DOUGLAS LAMM, Individually and on
behalf of DOUGLASS LAMM IRA


      Plaintiffs,

vs.

STATE STREET BANK & TRUST
COMPANY,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs Douglas Lamm, individually and on behalf of the Douglass Lamm IRA (hereinafter, collectively the "Plaintiffs"), by and through their undersigned attorneys, allege and aver as follows:

### Parties

      1.    Plaintiff Douglas Lamm ("Lamm") is an individual who at all relevant times resided in the Southern District of Florida.   Mr. Lamm is 64 years old.

      2.    Lamm has at all times relevant to this action been the settlor and beneficiary of the Douglas Lamm Individual Retirement Account (the "Lamm IRA").

      3.    On information and belief, Defendant State Street Bank & Trust Co. (hereinafter, "State Street") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts and maintains an office for the conduct of business in Jacksonville, Florida.

1

## Jurisdiction and Venue

4.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy in this matter exceeds the sum of $75,000, exclusive of interest and costs; and is between citizens of different states.

5.     Defendant, State Street, has purposely availed itself of the privileges and benefits of conducting business in the Southern District of Florida and a substantial amount of the events or omissions giving rise to the claim occurred in the Southern District of Florida. It is subject to personal jurisdiction in Florida pursuant to Fla. Stat. § 48.193, and venue is proper under 28 U.S.C. § 1391(a).

## Factual Allegations

**A.     State Street's Obligations to Plaintiffs**

6.     In this action, Plaintiffs seek recovery of approximately $1 million in losses they sustained as a result of the negligent, grossly negligent and willful violations of duties by State Street in its capacity as the custodian of Plaintiffs' securities accounts. Plaintiffs assert claims against State Street for breach of contract, negligence, gross negligence, breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, aiding and abetting fraud, and negligent misrepresentation.

7.     State Street is a trust company organized under the laws of the Commonwealth of Massachusetts.  It, *inter alia*, provides services to mutual funds and their advisers, collective investment funds, corporate and public pension funds, insurance companies, operating companies and non-profit organizations.

8.     State Street's Global Services division manages its custody services department.   It markets its capabilities by claiming, among other things, as follows:

Through our global custody network covering more than 100 markets, our team of

2

experienced industry professions brings you extensive market and custody expertise...

\*\*\*

**Safekeeping.**   We provide world-class custody and recordkeeping of assets through our relationships with local depositories, sub-custodians and agent banks.

**Network Management and Information Services.** Our network of providers and market infrastructures is managed with an emphasis on quality, risk management, transparency, market intelligence and leadership.

\*\*\*

**Reporting Services**.   Our reporting capabilities provide you with real-time views into the details of your custodian transactions, including trade status, asset positions, cash forecasting, intraday cash reporting and daily and monthly priced holdings....We work closely with you to create a customized solution, delivering operational efficiencies and greater transparency to your business.

9.      State Street further advised it clients that it "…recognize[s] the necessity of providing you with timely and accurate settlement services…[and] [w]e closely monitor our clients' assets and can work with local market participants to expedite the return of securities in the event you need to sell a position."

10.     As a self-described industry leader in providing custody services, Plaintiffs had a right to expect that State Street would undertake to provide the highest level of custodial services.   At a minimum, Plaintiffs had a right to expect that State Street would act competently and forthrightly in maintaining their accounts.   State Street's acts and omissions as identified below are particularly egregious given State Street's expertise in providing "world class custody and recordkeeping" services.

11.     Beginning in approximately 2001, Plaintiffs engaged James Tagliaferri ("Tagliaferri") and his investment firm, Taurus Advisory Group, LLC, as their investment advisors.

12.     In 2007, Tagliaferri moved his principal office from the State of

3

Connecticut to the British Virgin Islands and reorganized his investment advisor firm as TAG Virgin Islands Inc. ("TAG"), a Securities and Exchange Commission ("SEC") registered investment advisor.

13.     TAG was authorized by Plaintiffs to exercise discretion in the purchase, sale, exchange and disposition of stocks and bonds and other securities for or on behalf of Plaintiffs consistent with Plaintiffs' investment objectives of preservation of capital, growth and income.   A significant portion of the Plaintiffs' assets were entrusted to TAG.

14.     Pursuant to SEC Rule 206(4)-2, 17 C.F.R. 275.206(4)-2 and the Investment Adviser's Act of 1940, 15 U.S.C. 80b, TAG, as an investment advisor, was required to use a "qualified custodian" to hold customer accounts such as those belong to Plaintiffs. State Street was a "qualified custodian" bank and trust company.

15.     The purpose and effect of requiring the use a "qualified custodian" is to ensure the safeguarding and proper recordkeeping and movement of the client's assets.   As part of its functions, the custodian settles all purchases and sales in the account, delivers all securities in and out of the account, maintains possession of the securities owned by the client, manages all cash transactions in and out of the account including the receipt of dividends and interest, and provides regular reports to the client on the activities in the account and current valuations of the assets held.

16.     For the custodian to accept discretionary instructions from TAG, Plaintiffs were required to execute custodial agreements with the "qualified custodian."   The Custody Service Account Agreements that were executed by the Plaintiffs are annexed hereto as composite Exhibit "1."

17.     State Street, in connection with its merger with Investors Bank & Trust Company into State Street in 2007, took over the custodial obligations under the Custody Service Account Agreements previously executed by Plaintiffs, and it was represented to Plaintiffs that the

4

custody agreements continued to govern the custodial relationship between Plaintiffs and State Street.

18.     Pursuant to the arrangement and for the services that it performed for Plaintiffs, State Street was entitled to receive, and did receive, an annual fee of 5 basis points (.0005) of the value of the assets in Plaintiffs' accounts payable quarterly.  As such, for State Street to properly determine the fee to which it was entitled, State Street was required to accurately calculate the value of the assets held in custody for the benefit of Plaintiffs.

19.     The custodial agreements imposed certain duties and obligations upon State Street, including, among other things, the requirement that State Street (i) render monthly account statements with the current market values State Street believed to be reliable, and (ii) collect, receive, and take delivery of investments as agent for the Plaintiffs.

20.     In addition to contractual obligations, State Street also was subject to certain duties arising by operation of law. Those duties include, without limitation, compliance with the regulations of the United States Treasury Department's Office of Controller of the Currency ("OCC") and local laws for custodian banks and SEC regulations related to custodians for registered investment advisors.

21.     By way of example only, the OCC designated the British Virgin Islands as a High Intensity Financial Crime Area ("HIFCA") and required banks transacting business in HIFCA areas, such as State Street in connection with its dealings with TAG, to operate with higher degrees of care and attention due to the possibility of financial crimes.

22.     State Street also acted as IRA custodian and trustee over the Lamm IRA pursuant to Section 408 of the IRS Code and the federal regulations promulgated thereunder, 26 C.F.R. 1.408-2 *et seq*.

23.     For the Lamm IRA account, State Street had additional duties imposed by

federal law.   As a matter of federal law, State Street was under a fiduciary obligation to, among other things:

    a.    Acquire and hold particular investments specified by the trust instrument, Treas. Reg. 1.408-2(e)(viii)(6)(i)(A);

    b.    Keep custody of investments and, except for investments pooled in a common investment fund in accordance with the provisions of the treasury regulations, to refrain from commingling the investments of each account with any other property.   Treas. Reg. 1.408-2(e)(v)(A);

    c.    Deposit assets of accounts requiring safekeeping in an adequate vault, Treas. Reg. 1.408-2(e)(v)(B);

    d.    Determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 month after the proceeding valuation, Treas. Reg. 1.408-2(e)(5)(ii)(E); and

    e.    Receive, issue receipts for, and safely keep securities, Treas. Reg. 1.408-2(e)(4)(ii)(A).

**B.**    **State Street's Acts and Omissions**

    24.    As of April 2007, Lamm's individual account (account no. 377336380) had a reported asset value of approximately $1.5 million consisting substantially of equity securities, fixed income and cash.   Lamm's IRA account (account no. 377339580) had a reported asset value of approximately $310,000 consisting substantially of equity securities, fixed income and cash.

    25.    Shortly thereafter, and around the time of Tagliaferri's move from Connecticut to the Virgin Islands, TAG changed its management style.   Using its discretionary authority, TAG sold Plaintiffs' conservative investments and replaced them with risky and highly

speculative stocks of micro-cap companies, and purported notes from these micro-cap companies, and personal loans and mortgages.

26.     In so doing, TAG violated SEC Rule 206 which requires registered investment advisors to invest client funds in suitable investments.   Plaintiffs were not asked to and did not execute new suitability forms acknowledging or consenting to the change in investment strategy after necessary disclosure.

27.     State Street was at all material times aware of the changes being made in the accounts by TAG from its processing and settling of TAG's transactions and, in fact, State Street reserved the right to charge additional fees due to the difficulty in settling unusual or illiquid securities transactions.

28.     In connection with the investment changes made by TAG, TAG issued instructions for State Street to disburse funds for Plaintiffs' purchase of notes in micro-cap companies and to make personal loans to friends of Tagliaferri.   In each instance, State Street wired funds out of Plaintiffs' accounts, and reported the purchases on Plaintiffs' monthly statements.   However, State Street failed to settle the transactions by receiving securities in proper form.

29.     In most instances, State Street received and accepted "notes" that were signed by TAG and Tagliaferri, rather than the purported issuers of the notes. In other instances, State Street accepted notes issued to be paid to the order of the Hunter & Co., having the same address as TAG, rather than to Plaintiffs.

30.     The "notes" from TAG were obviously fraudulent on their face.   The notes at best were nothing more than IOU's issued by TAG to Plaintiffs, and could not and did not constitute notes from the micro-cap companies to Plaintiffs.

31.     The notes purportedly issues by the micro-cap companies that were payable

7

to Hunter & Co., with the same address as TAG, on their face, fail to reflect any investment by Plaintiffs in the notes.

32.    State Street should never have settled Plaintiffs' transactions in the fake notes.   The notes were so unusual that it they could not possibly have been settled automatically. Instead, the settlement process would have required the assistance and review of an employee of State Street.   State Street acquired knowledge of the fraud through its review and deposit of the fake securities.   Alternatively, State Street's failure to acquire knowledge through its settlement of the notes constitutes negligence, gross negligence and willful misconduct.

33.    State Street should have immediately informed Plaintiffs that the note transactions were not in proper form and constituted an attempted fraud by TAG.

34.    Instead, and compounding the deception, State Street prepared and delivered to Plaintiffs monthly statements which falsely identified the true nature of the "assets" in Plaintiffs' accounts.   Among other things, State Street identified that each of the securities in Plaintiffs' account bore a CUSIP number.   A CUSIP number is the hallmark of a legitimate domestic security. CUSIPs consist of a unique 9 character numerical identifier assigned by Standard & Poor's to facilitate the clearing and settlement of trades.   State Street knew, should have known, or was negligent and grossly negligent in not knowing, that the CUSIP numbers it was reporting on the monthly statements were false.   Alternatively, State Street was negligent and grossly negligent in not validating and confirming the CUSIP numbers it was reporting on its monthly statements.   Allowing a fake CUSIP number to be placed on the monthly statements was intended to and did leave the impression with Plaintiffs that the security, note or subordinated note was a legitimate, marketable and/or registered security.

35.    State Street's monthly statements also falsely identified many of the notes as being obligations of the purported company issuers when, in fact, State Street knew or should

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

have known, or was negligent and grossly negligent in not knowing, that the notes were issued by TAG and Tagliaferri.   The statements further failed to reflect that a number of the notes were obligations owing to Hunter & Co., not the Plaintiffs, and omitted to state the subordinated nature of certain of the securities even assuming that they were enforceable.   State Street knew or should have known, or was negligent and grossly negligent in not knowing, that the information it was reporting to Plaintiffs was inaccurate and false.

36.     In addition, State Street settled and disbursed funds in transactions for stock share certificates without receiving timely possession of the certificates.   Despite the lack of possession of certificates, State Street reported on the monthly statements that Plaintiffs held stock or notes of the companies.

37.     The monthly statements also reported false and misleading current prices of the "securities" in Plaintiffs' accounts including, *inter alia*, valuing notes that had fully matured and were in default at par value.   State Street knew or should have known, or was negligent and grossly negligent in not knowing, that the current market values it reported on the monthly statements lacked any reliability.

38.     State Street had or was in possession of information from which it could have discerned the true nature of the TAG transactions which it settled on Plaintiffs behalf. Instead of accurately reporting the information so that Plaintiffs likewise would have known and would have been able to determine the attendant risk, State Street issued highly misleading and false monthly statements that allowed TAG to defraud Plaintiffs.

39.     The following transactions were directed by TAG, with the assistance of State Street, and resulted in the delivery of "notes" into Plaintiffs' accounts which were executed by TAG rather than the company purporting to be the obligor:

a.     In or about November 20, 2007, $75,000 was disbursed by State Street, at

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

TAG's instructions, to an unknown account at North Fork Bank to purchase an "IEAH Inc. Convertible Secured Note".   However, eight days later, State Street received and accepted a one page document (annexed hereto as Exhibit "2") which is not a note, inasmuch as it is not signed by the purported obligor, IEAH Inc., but by the TAG.   This "note" was not rejected by State Street as being in improper form, but instead was retained by State Street and credited to Plaintiffs' account. This "note" was reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 6% interest and due November 19, 2008.   Not a single interest or principal payment was ever made to Plaintiffs, and yet this purported note was reflected on such monthly statements as having a market value of $75,000 through February 2011, eight hundred and thirty one days past its maturity date.   A copy of the February 2011 account statements are annexed hereto as Exhibit "3". Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $75,000 on this transaction.

> b.      In or about July 15, 2008, $200,000 was disbursed by State Street at TAG's instructions, to an unknown account at Valley National Bank to purchase a "Mortgage Sub Note." However, 28 days later, State Street received and accepted a one page document (annexed hereto as Exhibit "4"), which is not a "mortgage sub note," inasmuch as it is not signed by the purported obligors, Michael and Christine Iavarone (who upon information and belief are business associates or friends of Tagliaferri), but rather by TAG.   This "note" was not rejected by State Street as being in improper form, but instead was retained by State Street.   This "note" was reflected on the monthly statements provided by State Street to Plaintiffs as a note with a market value of $200,000 through February 2011.   Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $200,000 on this transaction.

> c.      In or about August 5, 2008, $50,000 was disbursed by State Street at TAG's instructions, to an unknown account at National City Bank, to purchase an "IEAH Inc. Convertible

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

Note".   However, on September 22, 2008, 48 days later, State Street received and accepted a one page document (annexed hereto as Exhibit "5") which is not a note, inasmuch as it is not signed by the purported obligor, IEAH, Inc., but rather by the TAG.   This "note" was not rejected by State Street as being in improper form, but was instead retained by State Street.   This "note" was then reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 6% interest and due August 4, 2009.   Not a single interest or principal payment was ever made to Plaintiffs and yet this purported note was reflected on such monthly statements as having a market value of $50,000 through February 2011, five hundred seventy three days past its maturity date. Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $50,000 on this transaction.

    d.  In or about January 6, 2009, $30,000 was disbursed by State Street at TAG's instructions, to "#PROC02" (an unknown account), to purchase an "IEAH Note".   However, on January 15, 2009, State Street received and accepted a one page document (annexed hereto as Exhibit "6") which is not a note, inasmuch it is not signed by the purported obligor IEAH, Inc., but rather by TAG.   This "note" was not rejected by State Street as being in improper form, but was instead retained by State Street.   This "note" was reflected on the monthly statements provided by State Street to Lamm as a note paying 6% interest and due December 18, 2009.   Not a single interest or principal payment was ever made to Plaintiffs and yet this purported note was reflected on such monthly statements as having a market value of $30,000 through February 2011, four hundred and thirty seven days past its maturity date.   Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $30,000 on this transaction.

    e.  On or about November 2, 2009, $60,000 was disbursed by State Street, at TAG's instructions, to an unknown account at Bank of America, to purchase a "National Digital

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

Medical Archive, Inc. note."  However, on December 31, 2009,  State Street received and accepted a one page document (annexed hereto as Exhibit "7") which is not a note, inasmuch as it is not signed by the purported obligor, National Digital Medical Archive, Inc. ("NDMA"), but rather by TAG.  This "note" was not rejected by State Street as being in improper form, but instead was retained by State Street.  This "note" was then reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 10% interest and due June 15, 2011.  Not a single interest or principal payment was ever made to Plaintiffs and this purported note was reflected on such monthly statements as having a market value of $60,000 through February 2011. Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $60,000 on this transaction.

      f.     On or about November 6, 2009, $100,000 was disbursed by State Street at TAG's instructions, to an unknown account at Valley National Bank, to purchase an "$M^2$ Systems Corporation note."  However, on December 1, 2009,  State Street received and accepted a one page document (annexed hereto as Exhibit "8"), which is not a note, inasmuch as it is not signed by the purported obligor, $M^2$ Systems Corporation ("$M^{2}$"), but rather by TAG.   This "document" was not rejected by State Street as being in improper form, but was retained by State Street.  This "note" was then reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 12% interest and due February 23, 2010.  Not a single interest or principal payment was ever made to Plaintiffs and this purported note was reflected on such monthly statements as having a market value of $100,000 through February 2011, three hundred and seventy days past its maturity date.   Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $100,000 on this transaction.

      40.   None of the aforementioned purported "notes" created any legally enforceable right by Plaintiffs to payment against the purported obligors.  The "notes" should

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

have been rejected by State Street, should not have been accepted for custody and safekeeping, and should not have been paid for from Plaintiffs' accounts.   As a result of State Street's failure to properly discharge its responsibilities with respect to the six (6) transactions set forth in paragraph 39, Plaintiffs' accounts sustained losses in the principal amount of Five Hundred Fifteen Thousand Dollars ($515,000).

        41.    In addition to the disbursement of Plaintiffs' funds from their custody accounts in return for the receipt of worthless paper described in paragraph 39, State Street permitted, on several occasions, the delivery and receipt of notes which were not payable to Plaintiffs, to be held in Plaintiffs' custody accounts and falsely reported to them as having a market value equal to (at least) the cost of such notes.   These instances include:

        (a)    A $25,000 Conversion Services International, Inc. Note bearing interest at 7% and due April 30, 2012, for which Lamm paid $25,000 on or about December 24, 2007, and which was reported on the monthly statements provided by State Street to Plaintiffs as an asset in Lamm's account with a market value of $25,000, was actually a note not made payable to Lamm, but to an entity known as "Hunter & Co.", with the same address as TAG (See Exhibit "9").   Not a single principal payment was ever made to Lamm and yet this purported note, not payable to Lamm, was reflected on the monthly statements provided by State Street to Plaintiffs as having a market value of $25,000.   Plaintiffs lost $25,000 on this transaction.

        (b)    A $75,000 Drexel Holdings Limited Note bearing interest at 12% and due July 30, 2009, for which Lamm paid $75,000 on or about March 25, 2008 (and subsequently extended or exchanged) and which was reported on the monthly statements provided by State Street to Plaintiffs as an asset in Lamm's account with a market value of $75,000 and $83,868, was actually a note not made payable to Lamm, but to an entity known as "Hunter & Co." with the same address as   TAG (See Exhibit "10").   Not a single interest or principal payment was ever

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

made to Lamm and yet this purported note, not payable to Lamm, was reflected on the monthly statements provided by State Street to Plaintiffs as having a market value of $83,868 through February 2011, despite having a maturity date of July 30, 2009 (as reflected on the purported note) or January 31, 2010 (as reflected on the statements).   Plaintiffs lost $75,000 on this transaction.

(c)      In or about March 18 and 19, 2009, $45,000 was disbursed by State Street at TAG's instructions, "to another account" (unidentified) to purchase a "Protein Polymer Technologies, Inc. note". However, on March 30, 2009, State Street received and accepted a Protein Polymer Technologies, Inc. ("PPTI") note not made payable to Lamm, but to an entity known as "Hunter & Co.," with the same address as TAG (See "Exhibit "11").   This "note" was not rejected by State Street as being in improper form, but instead was retained by State Street. This purported note was reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 8% interest and due March 17, 2010.   Not a single interest or principal payment was ever made to Lamm and yet this purported note, not payable to Lamm, was reflected on such monthly statements as having a market value of $45,000 through August 2010, despite the fact that this note had a maturity date of March 17, 2010.   Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $45,000 on this transaction.

(d)      A $100,000 Equities Media Acquisition Corp. Inc. Note bearing interest at 13.64% and due January 31, 2010, for which Lamm paid $50,000 on or about October 9, 2008 and $50,000 on or about August 5, 2008 (and subsequently extended or exchanged) and which was reported by   State Street on the monthly statements provided to Plaintiffs as an asset in Lamm's account with a market value of $100,000, was actually a note not made payable to Lamm, but to an entity known as "Hunter & Co.", with the same address as   TAG (See Exhibit "12").   Not a single interest or principal payment was ever made to Lamm and yet this purported note, not payable to

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

Lamm, was reflected on the monthly statements provided by State Street to Plaintiffs as having a market value of $100,000 as of February 2011, despite having a maturity date of January 31, 2010. Plaintiffs lost $100,000 on this transaction.

(e)     A $25,000 Stanwich Absolute Return, Ltd. Note bearing interest at 18% and due January 31, 2010, for which Lamm paid $25,000 on or about March 30, 2009 (and subsequently extended or exchange) and which was reported on the monthly statement provided by  State Street to Plaintiffs as an asset in Lamm's account with a market value of $25,000, was actually a note not made payable to Lamm, but to an entity known as "Hunter & Co.", with the same address as   TAG (See Exhibit "13").   Not a single interest or principal payment was ever made to Lamm and yet this purported note, not payable to Lamm, was reflected on the monthly statements provided by State Street to Plaintiffs as having a market value of $25,000 through February 2011, despite having a maturity date of January 31, 2010.   Plaintiffs lost $25,000 on this transaction.

(f)     On or about October 21, 2009, $100,000 was disbursed by State Street at TAG's instructions, to an unknown account at Bank of America to purchase another "PPTI note". However, on November 10, 2009 State Street received and accepted a PPTI Note not made payable to Lamm, but to Hunter & Co (see Exhibit "14").   This "note" was not rejected by State Street as being in improper form, but was retained by State Street.   This purported note was reflected on the monthly statements provided by State Street to Plaintiffs as a note paying 10% interest and due April 20, 2010.   Not a single interest or principal payment was ever made to Lamm and yet this purported note, not payable to Lamm, was reflected on such monthly statements as having a market value of $100,000 through August 2010, despite the fact that this note had a maturity date of April 20, 2010.   Accordingly, Plaintiffs were led to believe that State Street had custody of a note and that note had value.   Plaintiffs lost $100,000 on this transaction.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

42.    The "notes" identified in paragraph 41 as being owned by Plaintiffs were not enforceable by Plaintiffs against the purported obligors as the notes were made payable to "Hunter & Co.", with the same address as TAG, not Plaintiffs.   State Street should have rejected the transactions, should not have accepted such "notes" for custody and safekeeping, and should not have allowed payment for such "notes" from Plaintiffs' accounts.   As a result of State Street's failure to properly discharge its responsibilities with respect to the six (6) transactions set forth in paragraph 41, Plaintiffs' accounts sustained losses in the principal amount of Three Hundred Seventy Thousand Dollars ($370,000).

43.    On several occasions, State Street also permitted the disbursement of Lamm's funds without the receipt of anything, much less a purported security, although in each instance, State Street's monthly statements reflect that these payments were in consideration for specific securities.   These instances include:

a.    On March 6, 2008, State Street disbursed $70,000 from Lamm's IRA account to an unknown account at Barclays Bank against receipt of a "Chelsea Note."   However, no such note was ever received in the account.

b.    On October 1, 2008, State Street disbursed $48,500 from Lamm's account to "#PROC02" (another account) against receipt of a "Deferred Comp Note."   However, no such note was ever received in the account.

c.    On or about November 18, 2009, State Street disbursed $25,000 from Lamm's account to an account at CapitalOne Bank against receipt of an "IEAH note."   However, no such note was ever received in the account.

44.    Under the circumstances presented in paragraph 43, State Street should have rejected the transactions and should not have allowed payment for such "notes" from Plaintiffs' accounts.   As a result of these improper disbursements by State Street, Plaintiffs'

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

accounts sustained losses of approximately One Hundred Forty-Three Thousand Five Hundred Dollars ($143,500).

45.     As a further indication of the abject failure of State Street to properly discharge its custodial obligations from at least 2007 through early 2010, State Street allowed funds to be disbursed from Plaintiffs' accounts without the receipt of securities on at least 10 occasions for periods of time in excess of 10 days and in at least eight instances for periods of time in excess of 40 days, longer than what is prudent business practice for custodians.

46.     During the relevant time period, State Street included in its monthly reports to Plaintiffs at least nine purported "notes" at market values equal to their principal amount (the cost to Plaintiffs), despite the fact that such "notes" had been in default for non-payment of principal of between 370 and 831 days.   Upon information and belief, none of these purported notes were ever presented by State Street to the obligors for payment at maturity and, as set forth above, the notes were never paid.

47.     In summary, $515,000 of Plaintiffs' funds were disbursed by State Street, at TAG's request, in exchange for worthless paper for "notes" executed by TAG rather than the purported obligors; an additional $370,000 of Plaintiffs' funds were disbursed by State Street, at TAG's request, for purported notes held by State Street as custodian of Plaintiffs' accounts, but which on their face reflected that they were payable to "Hunter & Co.", not Plaintiffs and are otherwise in default; and an additional $143,500 of Plaintiffs' funds that were disbursed by State Street, at the TAG's request, for purported securities that were never delivered to State Street for the benefit of Plaintiffs.   A total of $1,028,500 in principal was lost as a result of these failures on the part of State Street.

48.     By engaging in the acts and practices described above, State Street turned a "blind eye" to the activities of TAG in Plaintiffs' accounts and, in so doing, abandoned its duties

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

and responsibilities under the custodial agreements causing Plaintiffs' losses. Indeed, State Street

belatedly recognized and admitted that it issued inaccurate monthly statements of account.   In a

letter dated April 28, 2011 addressed to Lamm, State Street stated in part:

> April 28, 2011
>
> Mr. Douglas Lamm
> 20611 Linksview Circle
> Boca Raton, FL 33434
>
> Re: Account Number XX7336380 – Douglas Lamm
>       Account Number XX7339580 – Douglas Lamm IRA
> Dear Mr. Douglas Lamm:
>
> Beginning with your account statement for September of 2010, we have
> been including a notice each month highlighting that illiquid, thinly traded
> and/or private placement securities listed in your account were past due or
> otherwise past their stated date of maturity and/or that the valuations
> reported for such assets were provided by your investment manager, TAG
> Virgin Islands, Inc. (TAG).   Despite our repeated attempts to obtain
> updated valuations or confirmation that we should continue to use the
> previously reported valuations, we have not received valuation instructions
> from TAG for these assets since November 30, 2010 and, in the case of
> warrants valued by TAG, since July 30, 2010.
>
> As a result of our inability to obtain current valuations from TAG, we will
> no longer assign a value to the above referenced assets commencing with
> your April 2010 [sic] account statement.   The account statement will
> indicate a value of zero with respect to these assets.   Please note that the
> valuation of these assets as zero in your statement does not represent an
> assessment by us of the fair value of these assets but rather serves only to
> reflect the fact that TAG has not supplied us with current valuations.   As
> previously indicated, we do not provide independent valuations for illiquid,
> thinly traded and/or private placement securities.   We will be including an
> insert with your account statement describing the above valuation practice
> in relation to the relevant assets in your account.

A copy of the letter referred to is annexed hereto as Exhibit "16".

This advice and "warning" came far too late for Plaintiffs, inasmuch as all of the transactions set

forth above took place prior to "September of 2010."

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

49.     TAG was able to divert Plaintiffs' assets for its own use or benefit, or the use or benefit of their affiliates, because State Street disregarded its custodial duties and responsibilities.

## COUNT I -- BREACH OF EXPRESS CONTRACT

50.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

51.     Plaintiffs and State Street entered into Custody Service Custody Account Agreements ("Agreements") dated January 30, 2001 and December 6, 2002 (Exhibit "1") for the specific purpose of holding and safeguarding Plaintiffs assets, executing and settling transactions, and reporting the activities and holdings in Plaintiffs' accounts.

52.     Plaintiffs paid State Street valuable consideration for custodial services pursuant to the Agreements and have timely and properly performed all of their obligations under the Agreements.

53.  State Street materially breached the Agreements through its negligent, grossly negligent and/or willful conduct.   State Street breached the duties they owed Plaintiffs under the Agreements by, among other things, failing to properly record, execute and settle Plaintiffs' account transactions, failing to accurately record and disclose events, and failing to take proper custody of Plaintiffs' assets including but not limited to the following: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

54.   Plaintiffs have suffered damages as a direct and proximate result of State Street's material breaches of the Agreements.

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

## COUNT II -- BREACH OF IMPLIED IN FACT CONTRACT
(Alternative Count)

55.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

56.     An implied-in-fact contract exists between Plaintiffs and State Street under which State Street was, among other things, to hold in custodial accounts assets for the benefit of Plaintiffs; properly record, execute and settle securities transactions; properly disburse funds against receipt of securities; and advise Plaintiffs as to the market value of the securities held in the custodial accounts.

57.     Plaintiffs paid State Street for its custodial account services, thus performing their obligations under the implied agreements.

58.     State Street materially breached the agreements through its negligent, grossly negligent and/or willful conduct.   State Street breached the duties they owed Plaintiffs under the agreements by, among other things, failing to properly record, execute and settle Plaintiffs' account transactions, failing to accurately record and disclose events, and failing to take proper custody of Plaintiffs' assets including but not limited to the following: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing

21

on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

59.     Plaintiffs have suffered damages as a direct and proximate result of State Street's material breaches of the agreements.

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

## COUNT III--BREACH OF FIDUCIARY DUTY

60.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

61.     Plaintiff had custodial accounts with State Street.

62.     State Street owed to Plaintiffs, as owners and holders of the custodial accounts, a duty of care as a fiduciary, in that Plaintiff placed their assets in the custody and care of State Street, justifiably relied upon State Street to perform its obligations as a custodian in accordance with the Agreements and according to commercially reasonable standards.

63.     State Street breached the fiduciary duties it owed Plaintiffs by, among other things: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value

and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

64.     The foregoing breaches were the direct and proximate cause of damage to Plaintiffs.

65.     As a direct and proximate result of State Street's breaches of fiduciary duties to Plaintiffs, Plaintiffs have been damaged.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

## COUNT IV- AIDING AND ABETTING IN
## THE BREACH OF A FIDUCIARY DUTY

66.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

67.     At all relevant times, State Street had knowledge that TAG served as Plaintiffs' investment advisor and that TAG was vested with complete discretionary authority to purchase, sell and liquidate the securities in Plaintiffs' accounts and, thus, stood in a fiduciary relationship to Plaintiffs.

68.     TAG breached its fiduciary duties to Plaintiffs by, among other things, engaging in self-dealing, failing to disclose certain material conflicts of interest, misrepresenting the nature of investments, issuing fake promissory notes to Plaintiffs, reporting false valuations and CUSIP numbers, engaging in unsuitable investments for Plaintiffs, and otherwise failing to act honestly with and in the best interests of Plaintiffs.

69.     State Street knowingly aided, abetted and assisted TAG's breaches of fiduciary duty by, among other things, its failure to properly discharge its custodial duties which substantially assisted and facilitated TAG's misrepresentations, diversion, misappropriation and misuse of Plaintiffs' assets.

70.     State Street substantially and knowingly aided and abetted and assisted TAG by, among other things: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

71.     The foregoing breaches were the direct and proximate cause of damage to Plaintiffs.

72.     As a direct and proximate result of the TAG's breach of its fiduciary duties to Plaintiffs and State Street's knowingly aiding and abetting in that breach, Plaintiffs suffered damages.

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

## COUNT V- NEGLIGENCE

73.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

74.     State Street owed a duty of care to Plaintiffs to, among other things, (i) properly settle their transactions, (ii) accurately report Plaintiffs' transactions and the assets held in their accounts, and (iii) maintain custody of their assets in a manner that would safeguard against misuse and misappropriation by TAG.

75.     State Street through its negligence materially breached the duty of care it owed Plaintiffs.   State Street materially breached the duty of care it owed to Plaintiffs by, among other things: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

76.     State Street's negligence was the proximate cause of Plaintiffs' damages.

77.     The foregoing breaches were the direct and proximate result of Plaintiffs' damages.

78.     As a direct and proximate result of the breaches, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

## <u>COUNT VI- GROSS NEGLIGENCE</u>

79.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

80.     State Street owed a duty of care to Plaintiffs to, among other things, (i) properly settle their transactions, (ii) accurately report Plaintiffs' transactions and the assets held in their accounts, and (iii) maintain custody of their assets in a manner that would safeguard against misuse and misappropriation by TAG.

81.     State Street through its gross negligence and/or willful conduct materially breached the duties it owed Plaintiffs.   State Street materially breached the duty of care it owed to Plaintiffs by, among other things: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to identify and timely notify Plaintiffs that certain of the purported securities that State Street received, which were purported to

be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to identify and timely notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that, upon information and belief, is affiliated with TAG and shares the same address as TAG; (d) allowing on approximately ten occasions for cash to be diverted from Plaintiffs' accounts without timely delivery of a security in exchange; (e) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (f) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (g) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (h) asserting a right to and taking excessive custodial fees based upon its reporting of inaccurate, inflated or false market values; (i) failing to perform the audits, reporting and custodial duties required of IRA custodians; and (j) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

82.     State Street's breaches of duty amount to gross negligence and/or willful conduct.

83.     State Street's gross negligence and/or willful conduct was the proximate cause of Plaintiffs' damages.

84.     The foregoing breaches were the direct and proximate result of Plaintiffs' damages.

85.     As a direct and proximate result of the breaches, Plaintiffs have been damaged.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

WHEREFORE, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

## COUNT IV- AIDING AND ABETTING FRAUD

86.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

87.     At all relevant times, State Street had knowledge that TAG served as Plaintiffs' investment advisor and that TAG was vested with complete discretionary authority to purchase, sell and liquidate the securities in Plaintiffs' accounts and, thus, stood in a fiduciary relationship to Plaintiffs.

88.     State Street further knew or was severely reckless in failing to recognize that TAG was engaged in fraud against Plaintiffs by, among other things, (a) its possession of the fake "notes" that TAG had issued or delivered to it that had no value and which were obviously fraudulent; (b) taking or accepting on behalf of Plaintiffs "promissory notes" which were purportedly issued in favor of Plaintiffs but which were not signed by the purported obligor, but rather by TAG; (c) taking or accepting on behalf of Plaintiffs "promissory notes" which were purportedly issued in favor of Plaintiffs but which were not made payable to Plaintiffs but rather to "Hunter & Co.", a company that shares the same address as TAG; (d) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (e) accepting from TAG CUSIP numbers for the securities placed in Plaintiffs' accounts which State Street knew or was reckless in failing to know were fake ; (f) accepting from TAG inaccurate, inflated or false market values for the assets held by Plaintiffs which State Street knew or was reckless in failing to recognize had no basis in fact.

89.     State Street substantially and knowingly aided, abetted and assisted TAG's

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

fraudulent conduct by, among other things: (a) allowing Plaintiffs' funds to be disbursed as payment for fake "notes" that had no value and which were an obvious fraud; (b) failing to notify Plaintiffs that certain of the purported securities that State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not signed by the purported obligor, but rather by TAG; (c) failing to notify Plaintiffs that certain of the purported securities which State Street received, which were purported to be promissory notes in favor of Plaintiffs, were not payable to Plaintiffs but rather to "Hunter & Co.", a company that shares the same address as TAG; (d) allowing on at least three occasions for cash to be diverted from Plaintiffs' accounts without delivery of any security to State Street or one of its permitted sub-custodians; (e) listing fake CUSIPS on the monthly statements provided to Plaintiffs which State Street knew or should have known would be relied upon by Plaintiffs as proof of the legitimacy or marketability of such securities; (f) issuing monthly statements to Plaintiffs that included inaccurate, inflated or false market values for the assets held in Plaintiffs' custodial accounts; (g) maintaining that it was entitled to custodial fees based upon the inaccurate, inflated or false market values that it identified in the monthly statements; and (h) otherwise failing to report and disclose the obvious fraud of TAG to securities regulators and Plaintiffs.

90.     The foregoing breaches were the direct and proximate cause of damage to Plaintiffs.

91.     As a direct and proximate result of the TAG's fraud and State Street's knowingly aiding and abetting in that fraud, Plaintiffs suffered damages.

**WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

## COUNT VII- NEGLIGENT MISREPRESENTATION

92.     Plaintiffs reallege the allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

93.     State Street, as custodian of Plaintiffs' accounts, owed Plaintiffs a duty of care to properly and accurately report the positions, valuations and transactions in Plaintiffs' accounts.

94.     By providing demonstrably false and misleading information in the monthly statements, State Street fell below the standard of care it owed to Plaintiffs.

95.     Plaintiffs would not have permitted the assets in the accounts to be used in the manner in which they were used by the TAG had they not been deceived by such false monthly statements. The diversion of Plaintiffs' assets was accomplished and/or went undetected because of the failure of State Street to accurately report and discharge its custodial duties and obligations.

96.     Plaintiffs reasonably relied on State Street's representations contained in the monthly statements believing that they accurately reflected all information in their accounts, including but not limited to the existence of notes, the CUSIP numbers associated therewith, and the current prices identified in connection with the positions they held.

97.     As a direct and proximate result of State Street's negligent misrepresentations, Plaintiffs suffered damages.

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700

. **WHEREFORE**, Plaintiffs demand judgment against State Street for the damages they sustained, including pre-judgment interest, together with costs of this action, and such other and further relief as the Court deems just and proper

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all matters triable by a jury.

*Attorneys for Plaintiff:*

CARLSON & LEWITTES, P.A.

By:_____s/Curtis Carlson_____
          CurtisCarlson, Fla.Bar. No.236640
          1200 Suntrust International Center
          One Southeast Third Avenue
          Miami, Florida 33131
          Telephone: 305.372.9700
          Facsimile:   305.372.8265
          E-mail: carlson@carlson-law.net

32

## <u>CERTIFICATE OF FILING</u>

I HEREBY CERTIFY that on March 20, 2012, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF.


By:_____s/Curtis Carlson_____

CARLSON & LEWITTES, P.A.

One Southeast Third Avenue ● Suite 1200 ● Miami, Florida 33131 ● 305.372.9700